ELLIS, Judge.
This suit seeking compensation for total permanent disability is brought under the Workmen’s Compensation Act of Louisiana, particularly LSA-R.S. 23:1031.1 which is an amendment allowing a recovery for disability which results from certain designated occupational diseases, among which is included poisoning or other diseases resulting from contact with lead and lead compounds and metals, other than lead, and their compounds. The workmen’s compensation insurer of plaintiff’s employee is made the defendant. The District Court awarded judgment in favor of plaintiff for total permanent disability and the defendant has appealed.
The defendant denied in the lower court but admits in this court that the plaintiff proved with sufficient certainty on the trial that he had contracted lead poisoning and they do not dispute the trial judge’s finding that this disease was contracted while working for defendant’s insured. However, it is defendant’s position that the evidence clearly showed that by October 1956, as a result of treatment administered *373 to the plaintiff, he had completely been dispelled of all toxicity which resulted from the inhalation or ingestion of lead and was no longer disabled and consequently that he is entitled to compensation only up to the date of his examination by Dr. Samuel B. Nadler on Oct. 15, 1956.
On June 6, 1956, the plaintiff consulted Dr. Donald J. DeBlanc, general practitioner of Opelousas, Louisiana, who hospitalized the plaintiff on June 13, 1956, where he remained until June 30, 1956, after which he was re-admitted to the hospital on July 10, 1956 and remained until July 24, 1956. However, Dr. DeBlanc thought that plaintiff had lead poisoning but in the abundance of precaution called in Dr. Donald F. Gremillion, a specialist in the field of internal medicine, and he diagnosed plaintiff’s condition as that of plumbism or lead poisoning, and as a result of his diagnosis he treated the plaintiff with a new drug which is known as calcium di-sodium versonate, which reacts on the lead in such a manner as to hasten its passage from the body through th,e kidneys and the fecal stream. From the testimony, he was given a sufficient amount of the drug so as to greatly improve him or to get the desired effect. He still complained of weakness and Dr. Gremillion accordingly had him admitted to the Charity Hospital at New Orleans on July 25, 1956, for physical therapy, however, he left the hospital without notice or permission for the reason which he gave to the effect that “he didn’t want to starve.”
On August 6, 1956, he was examined by Dr. Mims Mitchell, Jr., specialist in the field of internal medicine of Lafayette, Louisiana, and Dr. Mitchell stated that the most common way for people to have lead poisoning was either by inhalation of lead fumes or by ingestion of lead and that when the lead gets into the body it is carried by the blood stream to different sites of the body, particularly the bones, and where it is deposited and is slowly excreted from the bones over a period of time. The lead which is deposited in the bones can be reactivated by drunkenness or excess use of alcohol and sickness accompanied by high fever. However, the new drug, according to the medical testimony, which was administered to the plaintiff is supposed to remove all lead deposits from the body. The only true test as to whether there is excess lead in the body is by giving the subject a twenty-four hour urine lead excretion test which necessitates special containers and laboratory equipment and Dr. Mitchell did not have this available at the time he made his examination of plaintiff. Dr. Mitchell’s findings were limited. He stated that plaintiff’s symptoms were compatible with plumbism but that if he had actually suffered the poisoning that at the time he examined him “I felt he was almost within normal range again except the minor things touched on, the arm and leg.” His reference to the plaintiff’s leg was the fact that he found one shorter than the other which he definitely stated was not due to plumbism or lead poisoning. Dr. Mitchell did find some residual weakness in plaintiff's hand which he stated was not disabling but he would not positively state that the plaintiff had fully recovered. He did state that in his opinion the plaintiff was progressing favorably and he was getting well from the disease. Dr. Mitchell explained that the plaintiff had acute lead poisoning rather than chronic and that one is more likely to recover completely from acute form rather than the chronic type.
Dr. Samuel B. Nadler, of New Orleans, Louisiana, a recognized specialist in internal medicine, examined the plaintiff from October 15 to October 18, 1956, and in order to do this had him hospitalized in Touro Infirmary in New Orleans. Dr. Nadler during this time testified that every test pertinent to the diagnosis of plumbism or lead poisoning was made with the result that there was no evidence of lead intoxication. Dr. Nadler went into detail in his testimony but we believe it sufficient on the question of whether the plaintiff had recovered from the effects of the lead poisoning on the date that this doctor *374 examined him to merely state the result of his detailed examination of plaintiff. Dr. Nadler also stated that he was not able to find any physical disability in the plaintiff which might have resulted from a previous lead poisoning. This doctor was very definite in his testimony.
We can reach but one conclusion from the testimony in this case, that plaintiff on the date that Dr. Nadler examined him at Touro Infirmary and made the exhaustive tests had fully recovered from the effects of his acute lead poisoning. This brings us to one of the main questions in the case as to whether one who has suffered from lead poisoning is by reason of that fact made more susceptible to a recurrence should he go back to his former trade of painting. It is plaintiff’s contention that should he return to his former occupation it would present a source of danger to his life and well-being and under such facts and circumstances he is not required to return to his former occupation. We agree if the testimony bears out plaintiff’s contention that it would be dangerous to his life or well-being to return to painting. On this point Dr. Gremillion on behalf of plaintiff, when asked if he would advise plaintiff to return to a painting trade, stated: “Well, sir, if he were my brother, I would advise him not to go back.” At another time he stated: “Well, it is advised that anyone who has had lead poisoning, if he goes back to work, should be very cautious, very, very cautious, but this is on (only) my opinion. If he were my brother I would ask him to find another job.” However, we find him testifying shortly thereafter as follows:
“Q. What would be your opinion with reference to a person who has been found to have suffered an acute case of plumbism, would you say that the presumption that he may again suffer with a recurrence of the symptoms by further exposure would be more than in the case of one who had not been subject to an exposure, a previous exposure? I will rephrase that question. Would the presumption that one who had been previously exposed to lead poisoning that he would be reinfected quicker than would one who had not been exposed to lead poisoning? A. That I cannot say, Sir.”
“Re Cross Examination
“By Mr. James Dubuisson: Q. The best then that you can say is that you just feel that a person who has once had lead poisoning is apt to be more susceptible to lead poisoning that someone else, is that correct? A. That would be my feeling.
“Q. Yes, but you have no reason to state that simply because a person has had .lead poisoning before, that he is more susceptible to lead poisoning after all the lead has been dispelled than he was before he had lead poisoning? You have no medical grounds for saying that? A. I know of nothing to say that definitely, Sir.
“Q. In other words^/lead poisoning is simply getting lead into the body and if you get it in you are going to get lead poisoning and if you happen to fool with a certain occupation by which you are exposed to lead, you are apt to get lead poisoning, isn’t that correct? A. That’s right, sir.
“Q. And it doesn’t matter whether you had it once or whether you had it three times, anybody who becomes exposed to lead can get lead poisoning ? That is true, isn’t it, Doctor ? A. Yes, if they take enough in them they will get poisoning.
“Q. Lead poisoning is not incurable? Is it? A. No, sir, I don’t think so.
“Q. After all there are too many people suffer from lead poisoning and true the immediate effects of it is very uncomfortable, but they are treated, they throw off the effects and they are perfectly normal, isn’t that right? A. *375 Well, sir, it depends on what kind of residual you have with it referrable to peripheral neuritis.
“Q. Which of course can be determined by neurological examination ? A. Competent neurological examination.”
The most that can be said for Dr. Gremillion’s testimony is that he would not advise the plaintiff to go back but he gave no reason which would substantiate plaintiff’s claim that it would be injurious to his well being or possibly endanger his life. He frankly stated that he did not know whether one who had been previously exposed to lead poisoning would be reinfected quicker than one who had not been exposed to lead poisoning.
Plaintiff offered the testimony of Dr. D. J. DeBlanc who stated that he would not advise plaintiff to return to his former employment or trade of painting and when asked “Why do you make that statement?” answered “Well, not from the personal knowledge of the subject but from reading up on the subj ect it stated, it is stated by — ” and at this point an objection was made which was sustained cutting off the doctor’s reason which is most important to his testimony. This doctor, however, did testify that as of January 15, 1957, he did not believe that the plaintiff was able physically to do and perform work which requires hard manual effort due to a condition of the stomach which he termed gastro-enteritis or colicky pains and a general feeling of weakness of which the plaintiff complained. The doctor, however, could not directly say that these two conditions were definitely due to or caused by the lead poisoning.
Dr. Mims Mitchell, testifying on behalf of the defendant, stated in the course of his examination that:
“Recross Examination By Mr. Lewis, Sr.:
******
“Q. What do the accepted medical authorities say with respect to the advisability of one who has suffered a heavy metal poisoning to resume that occupation which produced that ailment? Do they advise him to resume it, or stay away from it? A. Under proper conditions and proper use of masks, etc. that are well outlined now by the public health services, there is no danger to the individual to resume such activity, if he uses such conditions to work.
“Q. Isn’t it a fact that these heavy metals such as lead are not only inhaled, but may be ingested by a spot of it coming on one’s lips, or isn’t it also true that it is absorbed through the skin. A. Yes, it is absorbed.
“Q. In order to portect himself a man would have to cover his mouth and also his skin? A. The skin is not normally considered for developing signs of plumbism. The patient either develops it from ingestion, or from inhalation of lead fumes. The small amount of lead that could be obtained through skin contact is essentially negative.
“Q. You wouldn’t make that statement with respect to one that had been affected by this malady? A. Usually lead that has been ingested will be excreted over a period of time so that it will be completely eradicated from the body. You understand?
“Q. Let me ask you this. You would, then, take the position that it is perfectly safe for one who has suffered from lead or heavy metal poisoning to engage and pursue the occupation of painting, provided he uses a mask? A. No.
“Q. What did you say? A. I said if he uses certain precautions.
“Q. What precautions ? A. If he is going to spray then he should use a *376 mask that is available, — I am sure they are available. All painters are supposed to use it.
“Q. Suppose he paints by hand? A. I don’t feel he would obtain enough lead from ordinary activity for him to get into trouble again.
“Q. You mean by using a paintbrush he would not run the danger of being again affected by this malady? A. No — if that were true, all painters would have lead poisoning. That is just like if you get burned by sticking you hand on a stove. You can take an asbestos glove and the stove will not burn you again.
“Q. Isn’t it a fact that the ingestion and inhalation of fumes is different somewhat from placing your hand on a hot stove? From a practical standpoint? A. The similarity is the same.”
Again on cross examination he testified:
“Q. Now, assuming that the patient recovers from the acute symptoms of metal poisoning, plumbism, to the point he is apparently normal again, will he be more likely to be affected with metal poisoning, or plumbism, if he again came in contact with those metals than a normal person who had never been in contact? A. Yes.
“Q. He would be? A. Yes. There are cases where a patient has been treated with one case of acute plum-bism and then had another case. Repeatedly.”
It is rather difficult to understand what this doctor meant to testify on this point. In one answer he states that there is no danger to the individual to resume such activity provided he used a mask when he sprayed paint, whereas in his second statement he appears to say that one who has suffered from lead poisoning and recovers would be more likely to be affected with the same if he again came in contact with the lead ‘ than a normal person who had never been in contact with lead or had lead poisoning. There is nothing in his testimony by which the two statements can be reconciled.
Dr. Nadler in testifying on this point had the following to say, under cross examination:
“Q. Dr. Nadler, assuming that a man does have a chronic or acute lead poisoning, as the case may be, and eventually the symptoms disappear, would you advise that he re-enter the occupation in which he was engaged at the time he contracted lead poisoning? A. With proper safeguards, yes. You see, lead intoxication can occur accidentally under the best circumstances of protection, but most lead intoxication is due to rank carelessness. There really is no excuse for an individual developing lead intoxication in an industry today, with what we know of it.
“I thing it is fair to say this, that the question would arise: ‘Does one bout with lead poisoning make an individual more susceptible to lead a second time?’ No. This is purely a quantative relationship, the amount of exposure, the amount of absorption, and many other factors are important, but actually it boils down really to the amount of lead that is available to do damage to the tissues, and in what concentration and in what time interval.
“This is not a matter of ‘Once having had it, you are more susceptible to it a second time.’ I would advise a man who had acute intoxication to stay out of lead.
“Q. Isn’t it a medically proven fact that this lead is stored in the bones of the body, and that it may re-occur, according to your testimony, after the acute symptoms have disappeared? The acute symptoms may re-appear several months later, as a result of the *377 lead stored in the bones? A. Not as a result of the storing, but as a result of mobilizing.
“Q. By different causes, such as drunkenness or infection? A. Yes, sir, absolutely correct.
“Q. Now, since this lead is stored in the bone, wouldn’t it take less lead to be taken in by this individual to make the acute symptoms re-occur than in an individual who had no lead deposit in his bones? A. That does not follow.
******
“Q. Now, you also stated that the disappearance of these symptoms would not guarantee that they would not reoccur? A. Well, let’s get straight about one thing: If the patient has had, and I am assuming from your question that he has had, adequate de-leading with calcium versenate, then he should have no chance for further recurrence as a result of mobilized lead from bones, because it is no longer there.
******
“Redirect Examination
“Mr. Dubuisson:
“Q. Doctor, let us assume that this man was given a total of seven gramas of calcium versenate for a period of eight days, beginning July 13, 1956 — ■ A. Seven grams each day?
“Q. Yes. A. Well, that is pretty good treatment.
“Q. And suppose that that had resulted in de-leading this individual, would it have been possible for lead to re-appear in the blood stream or in the urine, unless exposed to lead again? A. Not if he has been de-leaded this time. He just doesn’t have any more lead to store.
“Q. In other words, if he had had any lead in his body, as a result of this alleged poisoning which had reached its peak in the early part of June, 1956, that had disappeared at the time of your examination? A. Yes.
“Q. And it is your opinion, I think you have stated, that if this man is to get lead poisoning again, it would have to be from a new source of inhalation or ingestion of lead? A. Fresh exposure, yes.”
While Dr. Nadler’s testimony is apparently absolutely positive that one occurrence of lead poisoning does not make an individual more susceptible to lead a second time, there is one statement as will be noted in the above quoted testimony to the effect : “I would advise a man who had acute intoxication to stay out of lead.” This one sentence apparently conflicts with the rest of Dr. Nadler’s testimony on this point. It is probable that he meant that he would advise an individual who at the time had acute intoxication to stay out of lead, otherwise the statement would be in conflict with his positive testimony.
Dr. Henry Bruce Higman, a witness on behalf of the plaintiff, did not think that the versenate was supposed to entirely take care of the deposit of lead in the bones, and when question as to whether he would suggest that a man who is a painter and who has suffered from lead poisoning return to that type of occupation, stated: “I would advise against it.” He was not asked his reasons nor in fact questioned at any other time with regard to the further effect of previous lead poisoning upon a person.
In view of the unsatisfactory medical testimony on this point, in that two of the doctors gave no reasons for their opinion whereas the other two apparently have some conflicts in their testimony. Of course, Dr. Nadler’s testimony is most positive except for the apparent inconsistency mentioned. We believe that positive medical testimony could be produced so that the court could definitely and with legal certainty arrive at a proper decision on the *378 point at issue. We believe that the interests of justice would be best served by remanding this case for further expert medical testimony on the question of whether one who has recovered from lead poisoning will endanger his life or health by returning to his former occupation of painting provided he uses the customary and standard precautions.
There is no question, however, but that plaintiff is entitled to a judgment for compensation up to and including October 18, 1856, which was the date that he was discharged from the Charity Hospital after taking a test given by Dr. Nadler which the latter testified showed a recovery from the admitted lead poisoning that he had previously contracted.
It is therefore ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against the defendant awarding compensation at the rate of $30 per week through October 18, 1956, payable weekly with 5% interest on all past due installments from maturity and judgment in the additional sum of $730.80, the proven unpaid medical expenses, together with 5% interest from judicial demand, and all costs of these proceedings in the District Court and all costs of this appeal.
It is further ordered, adjudged and decreed that the case be remanded to the District Court for the purpose of the introduction of expert medical testimony on the question of whether plaintiff will endanger his life or health by returning to his former occupation of painting; and that after such testimony has been heard by the Lower Court and transcribed that same together with the entire record be returned to this court for additional review and/or judgment in according with the pleadings.
Amended and affirmed in part and remanded for further testimony in accordance with written decree, the final determination of the cause to await the return of the record and additional testimony ordered herein.